706 F.2d 111
 31 Fair Empl.Prac.Cas. 832,
31 Empl. Prac. Dec. P 33,516
William MASSARSKY and Gertrude Massarsky, his wife,
Appellants in No. 82-5176
v.
GENERAL MOTORS CORPORATION, a corporation of the State of
Delaware, Appellant in No. 82-5177.
 Nos. 82-5176, 82-5177.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1982.
Decided April 14, 1983.
Rehearing and Rehearing En Banc Denied May 11, 1983.
 
 Robert H. Jaffe (argued), Howard G. Schlesinger, Jaffe & Schlesinger, Springfield, N.J., for appellants in 82-5176.
 James J. Crowley, Jr. (argued), Linda B. Celauro, Carpenter, Bennett & Morrissey, Newark, N.J., Otis M. Smith, Gen. Counsel, Eugene L. Hartwig, Associate Gen. Counsel, David M. Davis, General Motors Corp., Detroit, Mich., for appellant in 82-5177.
 Before ALDISERT, SLOVITER and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This complex age discrimination case had its genesis in a decision by General Motors Corporation (the company) to lay off plaintiff William Massarsky in February 1971 as part of its reduction of the plant workforce. At that time, the Company retained a younger employee who was junior in service to Massarsky. Complaining that the Company discriminated on the basis of age in violation of the Age Discrimination in Employment Act of 1967 (ADEA or the Act), 29 U.S.C. Secs. 621 et seq. (1976 & Supp. V 1981), Massarsky brought suit in 1976 in the United States District Court for the District of New Jersey.[1] After a long series of complicated procedural disputes, the case was tried and, based on the jury's answers to special interrogatories, the court entered judgment on all claims in the defendant's favor. Massarsky appeals from the denial of his post-trial motions for judgment notwithstanding the verdict and for a new trial. We affirm.[2]I. FACTS AND BACKGROUND
 
 
 2
 General Motors hired William Massarsky on September 30, 1963, when he was 40 years old. He was assigned on a full-time basis to the process engineering department of the New Departure-Hyatt Bearings Division of the Company at its facility in Clark, New Jersey. On February 28, 1971, after more than seven years of service to the Company, he was laid off from his job as a senior process engineer during a division-wide reduction in force due to an economic downturn.
 
 
 3
 The system used by General Motors to select employees for layoff was set forth in the company handbook entitled "Working with General Motors." The handbook described the Company's layoff policy as based on the length of the employee's service with the Company, ability, merit, and capacity being equal.[3] Massarsky established at trial (and the Company did not dispute) that employee Joseph Biondo, age 25, was retained during the Company's reduction in force in February 1971. At the time, Biondo was a fifth-year student enrolled in the General Motors Institute (GMI) under a work cooperative program with less than five years of Company service.[4] Notwithstanding that Massarsky had over two years more service than Biondo, the Company furloughed Massarsky but retained Biondo on the basis of an unpublicized company policy exempting GMI students from layoffs.[5]
 
 
 4
 General Motors recalled Massarsky to employment on February 27, 1976. During the five years of his layoff, several openings developed in the process engineering department which the Company filled by transfers and promotions of employees in active service with the Company. This comported with the Company's usual practice of filling vacancies, if possible, by transfers of active employees on the payroll. If no active employee were available, the Company would recall to employment a qualified laid-off employee to fill the vacancy. Three of the active employees who were transferred into the process engineering department during Massarsky's layoff were young GMI students with less service than Massarsky.[6]
 
 
 5
 In his complaint,[7] Massarsky alleged that General Motors had violated the federal Age Discrimination in Employment Act by selecting Massarsky for layoff and by its failure to recall him before 1976.[8] Massarsky proceeded on the theory that General Motors' policy of insulating GMI students from layoff during a reduction in work force at the expense of Massarsky and other older workers with longer service to the Company constituted a per se violation of the ADEA. Plaintiff also contended that the Company's internal policy of assigning GMI students to fill openings in a department while a senior employee was on layoff status also constituted a per se violation of the ADEA. Plaintiff's motions for directed verdict, for judgment notwithstanding the verdict, and for a new trial were all denied. On appeal, plaintiff has limited the issues for review to his ADEA claims and his pendent jurisdiction claim under the New Jersey statute.
 
 
 6
 II. THE MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
 
 
 7
 The Age Discrimination in Employment Act of 1967, 29 U.S.C. Secs. 621 et seq. (1976 & Supp. V 1981), was intended
 
 
 8
 to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.
 
 
 9
 29 U.S.C. Sec. 621(b). Although section 623(a) of the Act in fairly broad terms proscribes discrimination against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age,"[9] this broad prohibition is modified by section 631(a), which limits the protections of the Act to those between the ages of 40 and 70.[10] See 29 U.S.C. Sec. 631(a). Thus, it is not unlawful for an employer intentionally to discriminate against employees under 40 years of age.
 
 
 10
 Four exceptions to the ADEA are set forth in section 623(f) of the statute. First, discrimination on the basis of age is allowed "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. Sec. 623(f)(1). Second, the Act permits covered entities to "observe the terms of a bona fide seniority system or any bona fide employee benefit plan." Id. Sec. 623(f)(2). Third, it is not unlawful for an employer to "discharge or otherwise discipline an individual for good cause." Id. Sec. 623(f)(3). Finally, the Act permits employers to discriminate "based on reasonable factors other than age." Id. Sec. 623(f)(1).[11]
 
 
 11
 The United States Supreme Court has said little about the elements of a cause of action under the ADEA. However, because in many respects the provisions of the ADEA parallel those of Title VII, many courts have adapted to issues of age discrimination the principles of law applicable to cases arising under Title VII of the Civil Rights Act.[12] See Douglas v. Anderson, 656 F.2d 528, 531-32 (9th Cir.1981); Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir.1979); Schwager v. Sun Oil Co., supra, 591 F.2d at 60-61; Rodriguez v. Taylor, 569 F.2d 1231, 1239 (3d Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). A Title VII plaintiff may prosecute his claim under either of two distinct legal theories. First, he may allege that he is the victim of intentional discrimination, i.e., that his employer applied an expressly race-based or sex-based standard in its treatment of the plaintiff. This "disparate treatment" theory traces its roots to McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Alternatively, he may rely upon the so-called "disparate impact" theory of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). This theory applies when the employer's adverse action resulted not from any discriminatory motive but simply from application of facially neutral criteria that are alleged to have a disproportionate impact on members of the protected class and which cannot be justified by business necessity. See Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). See also Teamsters v. United States, 431 U.S. 324, 335-36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); Croker v. Boeing Co., 662 F.2d 975, 991 (3d Cir.1981).
 
 
 12
 From what we can determine, the plaintiff in the instant case apparently has attempted to straddle these two theories of discrimination. Massarsky argues simply that General Motors failed to present a legally sufficient defense to the plaintiff's prima facie case under the ADEA. We therefore analyze his claim under both the disparate treatment and disparate impact theories. In so doing, we are required to view the evidence and all reasonable inferences therefrom in the light most favorable to the Company, the prevailing party in the trial court. Schwager v. Sun Oil Co., supra, 591 F.2d at 62; Fireman's Fund Insurance Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir.1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).
 
 A. DISPARATE TREATMENT
 
 13
 A plaintiff alleging disparate treatment, whether under Title VII or under the ADEA, bears the ultimate burden of persuading the jury that his treatment was "caused by purposeful or intentional discrimination." Smithers v. Bailar, 629 F.2d 892, 898 (3d Cir.1980). See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). But because it often will be difficult for the plaintiff to obtain direct evidence of the employer's motive, the Supreme Court in McDonnell Douglas Corp. v. Green, supra, articulated a set of rules of proof that give the plaintiff the benefit of a presumption operating in his favor. Under the McDonnell Douglas approach, the plaintiff has the initial burden to establish a prima facie case of unlawful discrimination by a preponderance of the evidence. This prima facie case is easily made out: a plaintiff alleging a discriminatory layoff need show only that he is a member of the protected class and that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably.[13] Cf. Smithers v. Bailar, supra, 629 F.2d at 894-95; Rodriguez v. Taylor, supra, 569 F.2d at 1239. If the plaintiff makes this showing, the employer then bears the burden to "dispel the adverse inference from a prima facie showing under McDonnell Douglas," Smithers, supra, 629 F.2d at 894-95, by articulating "some legitimate, non-discriminatory reason" for its treatment of the employee. McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824.
 
 
 14
 Once the employer presents evidence showing lawful justification for its treatment of the plaintiff, the plaintiff must then prove that the asserted reason was merely a pretext for unlawful discrimination. The ultimate burden of persuasion remains on the plaintiff at all times; the defendant's burden is only to introduce sufficient evidence to create a genuine factual issue concerning the existence of a legitimate justification for the action. Croker v. Boeing Co., supra, 662 F.2d at 991. See Texas Department of Community Affairs v. Burdine, supra, 450 U.S. at 253-55, 101 S.Ct. at 1093-94. Nevertheless, the McDonnell Douglas model eases the plaintiff's burden considerably by compelling the employer to justify its conduct. This circuit has expressly applied the McDonnell Douglas approach to cases arising under the ADEA. See Rodriguez v. Taylor, supra; Smithers v. Bailar, supra.
 
 
 15
 In the instant case, Massarsky established a prima facie case of discriminatory treatment under the ADEA by showing that he was within the protected age class and was laid off from his job as a process engineer even though he was undisputably qualified for that position. It is also undisputed that a person considerably younger in age and with less seniority was retained. This placed on the Company the burden of producing some non-age justification for its employment action. General Motors countered by asserting that Massarsky's layoff was pursuant to company policy to lay off the employee with the least Company-wide service, except that under that policy GMI students were immune from layoff.
 
 
 16
 Massarsky claims that the policy of immunizing GMI students from layoff was not a "legitimate justification" for the Company's action because the Company thereby extended favorable treatment to a group predominantly composed of young employees (recent high school graduates). But any disproportionate effect of the Company's policy is irrelevant to a claim of "disparate treatment" so long as the personnel action was not motivated by any discriminatory animus.[14] To prevail on this aspect of his claim--intentional discrimination--Massarsky had to show that the Company's policy of insulating GMI students from adverse personnel actions, though age-neutral on its face, was a mere "pretext" for unlawful discrimination on the basis of age. For example, this conclusion would have been warranted had Massarsky established that the Company's purported policy was merely a post-hoc rationalization or a policy that had been adopted specifically for the purpose of concealing discrimination on the basis of age.
 
 
 17
 There was evidence, although offered by plaintiff as pre-trial admissions, that the Company had adopted a five page internal document containing guidelines for use inter alia by the Divisional Personnel Departments in connection with reductions in salaried work force. The guidelines document referred to "special considerations," among which was the following:
 
 
 18
 GMI students. GMI students should not be laid off. A division has a considerable investment in these students which should be protected. The GMI cooperative program should be continued.
 
 
 19
 The guidelines apparently were discussed at an administrative personnel conference on May 6, 1970. In addition, the Company offered evidence that the GMI institute is considerably more than a mere in-plant training program. GMI is a fully accredited five-year college in engineering and management. It operates degree programs in mechanical, electrical, and industrial engineering, and industrial administration. At the time of trial, it had a student body of 2,350 with approximately 20 percent minority students and as much as 35 percent women. Each student pays tuition. This evidence established that the Company policy with respect to GMI student immunity from layoff was in place sometime prior to Massarsky's furlough and that it was not pretextual or a coverup for intentional discrimination. The evidence was sufficient to rebut Massarsky's prima facie case of intentional discrimination.
 
 
 20
 After considering all the evidence, the jury returned a verdict for General Motors. The jury by special interrogatory determined that Massarsky failed to carry his burden of persuasion to establish that he was the victim of intentional discrimination because of age. This conclusion had a reasonable basis, given the paucity of evidence of motive presented in this case.
 
 
 21
 On motions for a directed verdict and for judgment notwithstanding the verdict, the movant must meet a strict test. These motions require the judge "to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding." Fireman's Fund Insurance Co. v. Videfreeze Corp., supra, 540 F.2d at 1177 (quoting Mihalchak v. American Dredging Co., 266 F.2d 875, 877 (3d Cir.), cert. denied, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 157 (1959)).
 
 
 22
 Of course, as the dissent observes, see infra at 127-28, where an employer's policy or practice is discriminatory on its face, it is unnecessary for the plaintiff to make a separate showing of intent to discriminate. Naturally, if General Motors' policy had been to select employees for layoff on the basis of their age, there would be no jury issue of intent. In that situation, the discriminatory treatment would be apparent from the terms of the policy. But here General Motors' policy is not facially discriminatory because it is not expressed in terms of age. The employees who were insulated from layoff received this favorable treatment on the basis of their status as GMI students, not their age. There is nothing to indicate that older persons were precluded from becoming GMI students, or that General Motors was not acting in good faith in operating the General Motors Institute. We simply cannot infer that the Company was using student status as nothing more than a proxy for age merely because the GMI student population contained primarily younger individuals.[15] In short, there is a vast difference between a shoddy policy framed in terms of age and a well-intentioned policy framed in terms of student status. To hold now that the intent to discriminate may be presumed from the circumstances of this case, in the face of the jury's finding that the policy favoring GMI students was not discriminatorily motivated, would be utterly incomprehensible.
 
 
 23
 The district court therefore acted correctly in denying the plaintiff's motions for a directed verdict and for judgment notwithstanding the verdict with respect to his layoff under a disparate treatment theory of the ADEA.
 
 B. DISPARATE IMPACT
 
 24
 In his appellate briefs, Massarsky primarily characterizes this case as one involving the alleged disparate impact of a facially neutral rule.[16] He contends that General Motors' policy of insulating GMI students from layoff during a reduction in force, in conjunction with the policy of laying off the employee with the least seniority, operated to the detriment of members of the protected age group.
 
 
 25
 Initially, it should be remembered that Griggs v. Duke Power Co., the landmark case in which the Supreme Court held that a showing of disparate impact alone is sufficient to establish unlawful discrimination, involved race discrimination under Title VII. Although the Second Circuit has expressly recognized the disparate impact doctrine in the ADEA context, see Geller v. Markham, 635 F.2d 1027 (2d Cir.1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981), this court has never ruled on whether a plaintiff can establish a violation of the Act by showing disparate impact alone.[17] But even assuming, without deciding, that the disparate impact theory does apply to age discrimination suits, the district court correctly ruled that Massarsky is not entitled to any relief. The plaintiff had failed to make out a prima facie case under this doctrine.
 
 
 26
 The plaintiff's initial burden with respect to a disparate impact claim is heavier than it is when disparate treatment is alleged. To establish a prima facie case under the disparate impact model, the plaintiff must show "that the facially neutral employment practice had a significantly discriminatory impact." Connecticut v. Teal, --- U.S. ----, ----, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982). See Albemarle Paper Co. v. Moody, supra, 422 U.S. at 425, 95 S.Ct. at 2375. "If that showing is made, the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination.... Even in such a case, however, the [employee] may prevail, if he shows that employer was using the practice as a mere pretext for discrimination." Connecticut v. Teal, supra, --- U.S. at ----, 102 S.Ct. at 2531 (quoting Griggs v. Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. at 854). It is apparent, however, that the employer's burden of justifying the employment practice does not arise until after the plaintiff has made out a prima facie case. See Albemarle Paper, supra, 422 U.S. at 425, 95 S.Ct. at 2375.
 
 
 27
 To establish his prima facie case of discriminatory impact, the plaintiff must show that the employer's selection process results in unfavorable treatment of a disproportionate number of members of the protected group to which the plaintiff belongs. See Dothard v. Rawlinson, supra, 433 U.S. at 329, 97 S.Ct. at 2726. Thus, an essential element of a disparate impact claim is a disparate impact on the protected group.
 
 
 28
 In the instant case, it is inescapable that Massarsky failed to establish this necessary element of his claim. Because the ADEA only prohibits discrimination against employees between the ages of 40 and 70, Massarsky had to show a disproportionate effect on individuals in that age group. He did, of course, show that the challenged employment practices of General Motors had a pernicious effect on him. But he offered no evidence to show that other similarly situated employees were likewise affected. An adverse effect on a single employee, or even a few employees, is not sufficient to establish disparate impact. See Whack v. Peabody & Wind Engineering Co., 595 F.2d 190, 194 (3d Cir.1979); Harper v. Trans World Airlines, Inc., 525 F.2d 409 (8th Cir.1976); Robinson v. City of Dallas, 514 F.2d 1271 (5th Cir.1975) (Title VII cases). We cannot simply assume that a disproportionate number of older employees were adversely affected by the Company's policy of insulating GMI students from layoff. Because General Motors' practice was to lay off the person with the least service to the Company (assuming that merit, capacity, and ability were equal), whenever a short-service employee was insulated from layoff because of his status as a GMI student, the layoff inevitably would fall on some other employee with slightly more seniority. But it was always only those employees with the least service to the Company who were in danger of layoff. Absent statistical proof, it is pure conjecture to believe that protected older individuals predominated among these short-service employees. Indeed, it is plausible that Massarsky was, as the Company maintains, "an anomaly" because he was a short-service employee in the protected age group.
 
 
 29
 We recognize that the GMI students who were insulated from layoffs because of the Company's policy may generally have been younger than the employees who were laid off in their place. But this possibility does not help the plaintiff. The ADEA is only implicated when a policy has a differential impact on those within the protected class, i.e., those between 40 and 70 years of age. Even if all laid off employees were older than the GMI students who received special treatment, the Act would not be violated unless those age 40 to 70 were disproportionately represented among the laid off employees. And the plaintiff has proffered no evidence to show that the Company's policy actually had this differential impact.[18]
 
 
 30
 The Supreme Court's recent decision in Connecticut v. Teal, supra, is fully consistent with this analysis. Teal involved a challenge to an examination used to select state employees for promotion to supervisory positions. Because plaintiff Teal failed the examination, the State excluded her from further consideration for permanent supervisory positions. Although the examination was racially discriminatory because it excluded a disproportionate number of black candidates, the State attempted to compensate for the effects of this discrimination by promoting a higher proportion of eligible blacks than whites in order to reach a nondiscriminatory "bottom line." The Supreme Court held that the examination had a disparate impact on plaintiff Teal because of her race, an impact that could not be cured by the State's extension of favorable treatment to others in the plaintiff's group. Thus, Teal stands for the proposition that an employment practice must be analyzed at "the first step in the employment process that produces an adverse impact on a [protected group], not the end result of the employment process as a whole." Costa v. Markey, 694 F.2d 876, 880 (1st Cir.1982).
 
 
 31
 Judge Sloviter apparently believes that the point at which General Motors' policy had a "disparate impact" occurred when the Company insulated GMI students from layoff. We fail to see how this action alone had any real impact on Massarsky or any employee. The insulation of GMI students from layoff was merely an administrative matter that, at the very most, increased to some small degree the potential that other employees, regardless of their age, might someday be furloughed in the event of operational cutbacks. But there was no tangible impact until it actually became necessary for the Company to lay off a process engineer, and it was then--and only then--that Massarsky was adversely affected. The reason Massarsky was selected for layoff was that he possessed the least seniority of all employees eligible for layoff. Thus, unlike Teal, where the plaintiff was affected by the discriminatory practice at the moment she was excluded from further consideration for promotion, Massarsky was not adversely affected until his low seniority identified him for layoff when in-plant force reductions became necessary.
 
 
 32
 The plaintiff maintains that General Motors offered no business justification for its discriminatory policy under the "reasonable factor other than age" exception set forth in section 623(b) of the ADEA. But because the plaintiff failed to make the prima facie showing of discrimination necessary to establish a violation of the ADEA under the disparate impact theory, the Company never became obligated to defend its practice. The ADEA does not preclude employers from adopting arbitrary or unreasonable employment practices, except when such practices involve discrimination against protected older individuals. The practices in the instant case were not shown to have any discriminatory impact, thus there was no need to justify them.[19] See EEOC v. Greyhound Lines, Inc., 635 F.2d 188, 191 (3d Cir.1980).
 
 
 33
 Thus, Massarsky's contention that he was entitled to judgment as a matter of law on his claim of discriminatory layoff is not correct. He has not shown that the district court erred in denying his post-trial motions.
 
 C. THE FAILURE TO RECALL
 
 34
 Massarsky also contends that General Motors violated the ADEA by its conduct in assigning GMI students to openings in the process engineering department rather than recalling Massarsky, who had a greater length of service with the Company than the GMI students.
 
 
 35
 On this issue too, Massarsky had the burden to prove a prima facie case of age discrimination in not recalling him. The district court held that the plaintiff met his initial burden with proof that between 1971 and 1976 four younger persons (Biondo, Glass, Mihelc, and Schultz) were promoted to open positions in the process engineering department and Massarsky was not recalled to fill one of those positions. The Company's explanation for its failure to recall Massarsky between 1971 and 1976 was that there were no openings in the process engineering department for which a laid-off employee was eligible before the Company recalled Massarsky. This was due to General Motors' policy requiring that it first fill available positions by transferring or promoting an active employee already on the payroll. According to the Company, Massarsky was not recalled to employment before 1976 simply because of his status as an "inactive employee" during that time. Every opening that became available after Massarsky's layoff was filled by the transfer of an active employee, although of less seniority than Massarsky, pursuant to company policy.
 
 
 36
 Some of the active employees who were transferred into the department during Massarsky's five-year layoff happened to be GMI students who were considerably younger than Massarsky and enjoyed less seniority but had never been laid off because of the protective treatment accorded GMI students. Massarsky's argument is that "[d]esignation of GMI student/management trainees as active employees who are entitled to fill openings over inactive employees with greater length of service patently results in a classification which adversely affected Massarsky's employment opportunities at [General Motors] because of age."
 
 
 37
 At first blush, Massarsky's argument has a logical and reasonable appeal. There is some authority within this circuit supporting the view that when an employer fills a vacant position without recalling a laid off employee who is qualified for the job, the employer commits a new violation of the Act if the failure to recall is because of age. See Cutright v. General Motors Corp., 486 F.Supp. 590, 593 (W.D.Pa.1980). See also Franci v. Avco Corp., 538 F.Supp. 250, 260-61 (D.Conn.1982). But whether Massarsky's complaint is analyzed as a claim of disparate treatment or of disparate impact, he has not established any grounds for relief with respect to the failure to recall. As with the discriminatory layoff charge, the jury evidently determined that the Company's employment practices were not a pretext for intentional discrimination on the basis of age. The jury had a reasonable basis in the Company's established policy on GMI students for its conclusion that there was no unlawful discriminatory motive behind the Company's actions in not recalling Massarsky until 1976.
 
 
 38
 Nor did Massarsky carry his burden of establishing that the Company's facially neutral recall policies had a disparate impact on employees in the protected age class. Although the GMI students had a job preference over Massarsky, this was due not to Massarsky's age but entirely to his inactive status resulting from his low seniority. On this record, there is no reason to believe that individuals between 40-70 years of age predominated among employees on inactive status. Massarsky has shown only that certain company policies unfortunately had an adverse effect on him; this does not establish any unlawful conduct on the Company's part.[20]
 
 
 39
 Accordingly, we perceive no error in the district court's denial of Massarsky's motions for a directed verdict or a judgment notwithstanding the verdict.
 
 III. THE MOTION FOR A NEW TRIAL
 
 40
 Massarsky also claims that the district court erred in denying his motion for a new trial. He asserts that the district court committed several errors during the course of the trial proceedings.
 
 
 41
 The plaintiff primarily contends that the trial court erred in several respects in its instructions to the jury, including the following instruction:
 
 
 42
 The plaintiff must prove that the reason stated by the defendant, General Motors Corporation, for laying off the plaintiff, [namely] that there was an economic necessity to reduce the number of Process Engineers at the Clark facility ... and on the basis of the plaintiff's short length of service and merit, capacity and ability, the plaintiff was a Process Engineer without whom defendant could best function, is a pretext.... In other words, the plaintiff must prove that the reason given by the defendant for laying off Mr. Massarsky was a pretext, but that the real reason or the determinative reason was age.
 
 
 43
 Massarsky challenges this instruction on the ground that it is erroneous because it fails to make any reference to the Company's internal policy insulating GMI student trainees from layoff and includes a prejudicial reference to his "short length of service" when in fact he had a longer length of service than Biondo. He also complains that the reference to the plaintiff as "a process engineer without whom defendant could best function" constituted a misleading comparison with Biondo's work skills when in fact no such comparison was made. These errors, plaintiff asserts, virtually amounted to a directed verdict for the defendant on the layoff issue.
 
 
 44
 We do not believe this instruction was improper. General Motors did indeed maintain that Massarsky was laid off solely on the basis of his seniority, pursuant to established company policy. The district court accurately summarized in its instructions the plaintiff's burden in a disparate treatment case to show that the employer's explanation for the employment decision is a mere pretext, and that age was a determinative factor in the decision.[21]
 
 
 45
 The failure to include in the instruction any reference to the Company's practice of exempting GMI students from layoff was not erroneous. Evidence of the existence of this policy was relevant primarily to a disparate impact claim, and because Massarsky failed to make out a prima facie case under this theory, it would have been wholly improper for the district court to instruct the jury concerning disparate impact.[22] Moreover, to the extent that the existence of a policy favoring GMI students may provide some circumstantial evidence of the employer's alleged pretext under a disparate treatment theory, we believe the district court acted sensibly in declining to single out for the jury any particular item of evidence, preferring that the jury assess on its own the evidence bearing on the Company's intent.
 
 
 46
 Similarly, with respect to the claim of a discriminatory failure to recall, plaintiff argues that the trial judge should not have instructed the jury to determine whether General Motors' explanation that prior to February 1976 "there was no open position in the Clark facility for which the plaintiff as an employee on layoff was eligible or qualified, is a pretext and that a determinative reason that he was not recalled until February 1976 was his age." But this instruction correctly summarized both the relevant law and the Company's articulated explanation for its action. It was within the district court's discretion to omit reference to the GMI student program and thereby avoid giving the jurors the impression that this evidence was particularly probative on the issue of motive.
 
 
 47
 Plaintiff also objects to the trial court's instruction that intent was a necessary element in Massarsky's case. But in a disparate treatment case--the theory on which the court submitted this case to the jury--the plaintiff must demonstrate that he has been the victim of intentional discrimination. See Texas Department of Community Affairs v. Burdine, supra. As for the disparate impact theory, where intent is not required, the court was correct, as we have shown, in not submitting this case to the jury on that theory.
 
 
 48
 Finally, Massarsky contends that it was error not to instruct the jury specifically that the existence of internal corporate policies which discriminate against protected individuals provided evidence of discrimination in the layoff of Massarsky and the subsequent failure to recall him. Such a charge, however, would have had no basis in the evidence, because Massarsky did not establish that General Motors' layoff policy discriminated against protected individuals. More important, the court did not err in concluding that it would be unwise for it to propose particular inferences that the jury might draw from the evidence. As a whole, we believe the charge to the jury was fair and free from error.[23]
 
 IV. THE MOTION TO AMEND THE COMPLAINT
 
 49
 Finally, plaintiff appeals from the district court's denial on several occasions of his motions to amend his pleadings to assert a pendent state law claim under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. Secs. 10:5-1 et seq. (1976). This allegation focuses on the district court's interpretation of the time limits contained in the New Jersey statute and the retroactive effect of a recent amendment to that provision.
 
 
 50
 Amendments, although liberally granted, rest within the sound discretion of the trial court under Fed.R.Civ.P. 15. The trial court may properly deny leave to amend where the amendment would not withstand a motion to dismiss. The Company contends that the inclusion of a claim under NJLAD would have been futile because the claim under that Act would have been subject to dismissal as time-barred. We need not decide that question, however, because the trial judge believed, as stated in his bench opinion denying plaintiff's post-trial motions, that "[t]he elements of the NJLAD are the same as for ADEA" and the court "cannot conceive that the jury would have found for plaintiff on this claim in view of its findings on the federal claim." We perceive no error in the construction of the New Jersey statute and in the court's denial of the motions to amend.
 
 V.
 
 51
 The judgment of the district court will be affirmed.
 
 
 52
 SLOVITER, Circuit Judge, dissenting.
 
 
 53
 When, in 1967, Congress originally addressed the serious social problem of age discrimination in employment, it did so because "older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs"; because "certain otherwise desirable practices may work to the disadvantage of older persons"; and because "the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave." Age Discrimination in Employment Act of 1967 [hereinafter ADEA], Pub.L. No. 90-202, Sec. 2(a)(1)-(3), 81 Stat. 602 (codified at 29 U.S.C. Sec. 621(a)(1)-(3)). The purpose of the Age Discrimination in Employment Act was, inter alia, "to promote employment of older persons based on their ability rather than age." Id. Sec. 2(b), 29 U.S.C. Sec. 621(b).
 
 
 54
 William Massarsky, a senior process engineer in General Motor's New Departure-Hyatt Bearings Division, had seven years seniority when he was laid off on February 28, 1971. He was not recalled until February 27, 1976, after the present lawsuit had been instituted. He was 48 years old at the time of the layoff. It is undisputed that GM chose to lay off Massarsky rather than a work study student from the General Motors Institute, who was assigned to Massarsky's department and paid out of the departmental budget, because of a GM policy not to lay off GMI students and to guarantee them the opportunity to complete their degrees.[1] Massarsky remained on layoff status for five years. It is undisputed that he was not recalled to work earlier because at least three additional GMI students were assigned to Massarsky's department after they graduated pursuant to a GM policy which classified GMI students as active employees upon their graduation, and gave them preference over inactive employees such as Massarsky.[2] Thus, Massarsky claims violation of the statute both for his initial layoff and the failure to recall.
 
 
 55
 Massarsky was admittedly within the protected age group for whom the ADEA was enacted.[3] Massarsky proved at trial that each of the GMI students who was favored over him was between 22 and 25 years old. Dr. William B. Cottingham, President of the General Motors Institute, testified that "the age makeup of our typical class is primarily in the eighteen to twenty category because we recruit primarily at high schools for our classes." Transcript of October 1, 1981 at 154. Thus, it is an ineluctable conclusion that those in the favored class, GMI students, were below 40. GM does not contend otherwise.[4]
 
 
 56
 Nonetheless, the majority finds no age discrimination in the GM policies which, by their very nature, favor younger workers over older workers. It reaches its improbable conclusion first, by holding that a showing of intent to discriminate, over and above the establishment of and adherence to the patently discriminatory policies at issue in this case, is necessary for the disparate treatment claim, and second, by holding that evidence that the policies favored the group of younger workers and had an adverse impact on Massarsky, an older worker, is insufficient to establish the disparate impact claim. I believe the majority errs in both respects. Furthermore, the majority fails to examine whether the GM policies qualify for the ADEA statutory defense of "differentiation ... based on reasonable factors other than age", 29 U.S.C. Sec. 623(f)(1), and fails to discuss how these GM policies can qualify as a legitimate, nondiscriminatory reason or as justified by business necessity. Finally, the majority affirms the district court's rather remarkable decision declining to instruct the jury on the heart of plaintiff's case, his claim that these policies either on their face or by their inescapable effect favor younger workers over older workers.
 
 I.
 DISCRIMINATORY TREATMENT
 A.
 Massarsky's Layoff
 
 57
 As in our recent case of Wilmore v. City of Wilmington, 699 F.2d 667 (3d Cir.1983), this case involves the interweaving of the two separate legal theories of liability used in employment discrimination cases, one predicated on discriminatory treatment and the other predicated on disparate impact. This case differs somewhat from the traditional discriminatory treatment case. Ordinarily, discriminatory or disparate treatment claims challenge discrete action directed against a single individual, such as discharge or discipline allegedly due to race, sex, or age, see, e.g., Worthy v. United States Steel Corp., 616 F.2d 698 (3d Cir.1980), or failure to provide certain advantages or services to a member of one group which were provided to members of the favored group, see, e.g., Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir.1980). Here, however, plaintiff does not claim that he, as an individual, was singled out for disparate treatment. Instead he claims that the GM policies which were applied to him resulted in disfavoring him as an older worker and favoring GMI students, who were younger workers.
 
 
 58
 In employment discrimination cases, claims of unfavorable employment practices resulting from an employer's policy have ordinarily been considered under disparate impact analysis. That analysis, as it evolved from Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), is directed to facially neutral policies which have a disparate impact on a particular race, sex or age group. Where the employment policy or practice is not facially neutral, it is considered discriminatory treatment. Although an intent to discriminate is a necessary ingredient of a discriminatory treatment case, the Supreme Court has never required or suggested that plaintiffs who have proven a facially discriminatory policy must make a separate showing of intentional discrimination. Thus in City of Los Angeles Department of Water & Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Court held that a requirement that female employees contribute more to a pension fund than male employees constituted discriminatory treatment, without any intimation that there was a need to make a separate finding of intent to discriminate. Indeed, an intent to discriminate in the sense used by the majority in this case as "motivated by any discriminatory animus," Majority op. at 118, was patently absent in Manhart since the unequal pension contributions had been established because women as a group do in fact live longer than men. Similarly, in Phillips v. Martin Marietta Corp., 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam), the Court held an employment policy refusing to hire women with preschool-age children constituted discriminatory treatment notwithstanding the fact that "no question of bias against women as such was presented." Id. at 543, 91 S.Ct. at 497. It remanded for consideration whether the employer could satisfy the statutory bona fide occupational qualification defense, but significantly did not remand so that the employer could show absence of intent to discriminate. In cases of facially discriminatory policy, the policy itself establishes the intent necessary to show discriminatory intent.
 
 
 59
 If GM had a policy that it would only hire applicants who were less than 40 years old, I assume we would hold that this facially discriminatory policy showed discriminatory treatment as a matter of law and would not submit to the jury the issue of intentional discrimination. There might be a jury issue on whether a statutory defense applied, but not on whether plaintiff had satisfied the requirement to show intentional discrimination. As in the Title VII cases, intent would be supplied by the policy itself. Similarly, if GM had a policy that it would insulate employees under 40 years of age from any layoff, again there would be no intentional discrimination issue to submit to the jury. Should this legal principle change merely because GM framed its policy in terms of favoring GMI students (who were all under 40) rather than in terms of favoring them qua their age? If a statute were directed at roses, and a grower described its flower as a fragrant multipetaled red bloom grown on a branch with thorns, is the flower any less a rose? Gertrude Stein would have rejected that suggestion with dispatch.
 
 
 60
 In some circumstances, there might be a jury issue as to whether a policy similar to GM's policy was discriminatory. In this case because the testimony of the GMI president concedes, and GM does not deny, that the GMI student group was exclusively under 40 years of age, see note 4 supra, the GM policy should be treated as facially discriminatory and there was no issue of intentional discrimination to submit to the jury. The focus of the majority's opinion should have been on whether GM has any defense or justification for that policy.
 
 
 61
 Instead of analyzing along this route, the majority predicates its analysis on the language from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), establishing a presumption which assists plaintiffs in making out a prima facie disparate treatment case. The order and allocation of proof referred to in McDonnell Douglas has little applicability in this case. The prima facie case recognized in McDonnell Douglas is useful for those plaintiffs who have difficulty finding direct evidence of discrimination. There is no indication in that opinion or its progeny that it establishes the exclusive method of proving discriminatory treatment. Direct evidence of discrimination obviously would suffice. Similarly, a facially discriminatory policy satisfies the requisite proof.
 
 
 62
 It is inconsistent for the majority to acknowledge that Massarsky established a prima facie case on his disparate treatment claim, but to conclude that Massarsky failed to show intentional discrimination. The intent to discriminate is presumed from the establishment of that prima facie case unless GM articulated a "legitimate, nondiscriminatory reason" for the layoff. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (emphasis added). This has just been reaffirmed by a unanimous Court in United States Postal Service Board of Governors v. Aikens, --- U.S. ----, ----, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983). The majority never adequately discusses whether GM did so.
 
 B.
 Failure to Recall
 
 63
 Massarsky's discriminatory treatment claim on the failure to recall should be analyzed in the same way as his layoff claim. Recall of laid off GM employees was on the basis of seniority, all other factors being equal. Massarsky waited five years for recall while GMI graduates with shorter service were reassigned upon graduation or promoted to fill openings in his department which Massarsky could have filled. GM justified this practice on its corporate policy to fill open positions with active employees before recalling laid off employees. Massarsky's challenge is not directed to that policy as such but to GM's policy to designate GMI graduates as active employees. Under that classification, GMI students are, upon graduation, entitled to preference in filling openings over inactive employees, notwithstanding their shorter service.
 
 
 64
 Massarsky has shown that GM's classification policy designating graduates as active employees resulted in the failure to recall him. Several GMI students were assigned to Massarsky's department after they graduated--Mihlec, age 23 (8/20/73); Morella, age 22 (2/1/76); and Ziegler, age 22 (2/1/76)--while he remained on layoff status. During this same period, Biondo, age 25, and Schultz, age 23, students previously assigned to that department, were reclassified upon graduation and filled positions which Massarsky could have filled. It was only after one of these younger employees with less seniority left GM that Massarsky was recalled.
 
 
 65
 Again, the majority holds that Massarsky failed to show discriminatory treatment in the failure to recall, by stating that "[a]s with the discriminatory layoff charge, the jury evidently determined that the Company's employment practices were not a pretext for intentional discrimination on the basis of age." Majority op. at 123. However, as developed above, when, as in this case, it is uncontested that GMI students are younger workers, a policy which classifies them as active workers upon graduation is facially discriminatory and carries with it a necessary finding of intentional discrimination. The central issue whether the policy of classification of GMI graduates as active employees could be justified under a statutory defense is never reached by the majority.
 
 II.
 DISPARATE IMPACT
 A.
 Massarsky's Layoff
 
 66
 The analysis which I believe appropriate for Massarsky's disparate treatment claims is based on equating GM's policies on GMI students and recent graduates with policies explicitly framed in terms of employees under 40 years of age. As noted in Part I, since GM has not contested that this favored group is exclusively under 40, I believe the relevant policies must be treated as facially discriminatory. If, however, we treat these policies as facially neutral, as the majority does, then the applicable analysis is that developed under the disparate impact theory. Plaintiff would be entitled to show that even in the absence of intentional discrimination, these policies favored younger workers and had an adverse impact on him.
 
 
 67
 Preliminarily, I find the majority's reluctance to decide that disparate impact analysis is appropriate for an ADEA claim surprising. As the Supreme Court recognized, "the [substantive] prohibitions of the ADEA were derived in haec verba from Title VII." Lorillard v. Pons, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). The Second Circuit has held disparate impact analysis should be applied to an ADEA claim. Geller v. Markham, 635 F.2d 1027, 1032 (2d Cir.1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). We should do the same. Cf. NAACP v. Medical Center, Inc., 657 F.2d 1322, 1331 (3d Cir.1981) (in banc) (disparate impact analysis applicable to the Age Discrimination Act of 1975, 42 U.S.C. Secs. 6101 et seq.).
 
 
 68
 The district court, for reasons which were never fully explained, visualized the case as a disparate treatment case only. Over plaintiff's objection, the court rejected plaintiff's contention that the case should be considered and submitted to the jury on a disparate impact theory. See, e.g., Transcript of October 5, 1981 at 6.28 (charging conference). In doing so, the district court distorted plaintiff's claim. Plaintiff's counsel explained to the court that plaintiff did not claim that GM "went after Mr. Massarsky personally because of his age." Id. Instead, it was plaintiff's claim that "it was the implementation of the overall policy through the personnel director that was involved that resulted in the impact on him because of his age." Id. at 6.29.
 
 
 69
 Since the trial court either misconceived or mischaracterized plaintiff's claim, it never dealt frontally with plaintiff's disparate impact theory, either in the opinion on judgment n.o.v. or in submitting the case to the jury. The majority affirms, apparently concluding that the district court's error was irrelevant because it believes that Massarsky failed to establish a prima facie case on disparate impact. Although the trial court never reached the issue, the majority finds Massarsky's disparate impact claim was inadequate because he failed to show "that the employer's selection process results in unfavorable treatment of a disproportionate number of members of the protected group to which the plaintiff belongs." Majority op. at 120.
 
 
 70
 As noted above, plaintiff has shown that the GM policy established a favored class, composed of younger employees, an age based classification. In most cases challenging age based classifications, the composition of the favored class is not as starkly apparent as in this case. Nonetheless, the courts have recognized the discriminatory impact of the policy. For example, in Geller v. Markham, supra, the court considered the district court's holding that a school board's policy to recruit new teachers at levels below the sixth step of the salary schedule, reached by teachers with more than five years experience, was discriminatory as a matter of law because 92.6% of all teachers over 40 years of age would have reached that "sixth step" cutoff. Even though a majority of teachers under 40 also had reached the "sixth step", the Second Circuit agreed "that the high correlation between experience and membership in the protected age group (40 to 65 years of age) would render application of the 'sixth step' policy discriminatory as a matter of law." 635 F.2d at 1033. Because the policy made it substantially less likely that a person over 40 would be selected, it was unlawful. The Geller court found it decisive that an overwhelming percent of the protected class was in the disfavored group. The record in this case supports an even stronger finding, i.e. that virtually 100% of the protected class is in the disfavored group because the favored student group is under 40. As in Geller, the fact that the policy may also disfavor laid off workers under 40 does not overcome the discriminatory impact on the protected class.
 
 
 71
 The majority's holding that it was not enough for Massarsky to prove an impact on Massarsky alone ignores the directly applicable language in Connecticut v. Teal, --- U.S. ----, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). There, Justice Brennan, writing for the Court, rejected the claim that there was no violation of Title VII because other employees in the protected group were favorably treated. The Court stated: "It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." Id. 102 S.Ct. at 2535. Justice Brennan made explicit that the focus on the individual adversely affected by the employer's policy or action should be applied in all Title VII cases, whether brought under the discriminatory treatment theory or under the disparate impact theory.
 
 
 72
 The fact remains ... that irrespective of the form taken by the discriminatory practice, an employer's treatment of other members of the plaintiffs' group can be "of little comfort to the victims of ... discrimination." Teamsters v. United States, supra, 431 U.S., at 342, 97 S.Ct., at 1858. Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired. That answer is no more satisfactory when it is given to victims of a policy that is facially neutral but practically discriminatory. Every individual employee is protected against both discriminatory treatment and against "practices that are fair in form, but discriminatory in operation."
 
 
 73
 Id. See also Spirt v. Teachers Insurance & Annuity Association, 691 F.2d 1054, 1061-62 (2d Cir.1982).
 
 
 74
 Justice Brennan predicated his interpretation of Title VII on the legislative policy and statutory language which precludes "limitations and classifications that would deprive any individual of employment opportunities." Connecticut v. Teal, 102 S.Ct. at 2531 (emphasis in original). The ADEA shows the same concern for the individual employee. Its prohibition is in haec verba with that of Title VII on which the Court relied. It makes it unlawful "to limit, segregate, or classify ... employees in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual's age," 29 U.S.C. Sec. 623(a)(2) (emphasis added). No reason is suggested why the analysis of Connecticut v. Teal is not equally applicable to an ADEA case. In the Court's recent opinion in EEOC v. Wyoming, --- U.S. ----, ----, 103 S.Ct. 1054, 1058, 75 L.Ed.2d 18 (1983), it stated that the ADEA "emphasized both the individual and social costs of age discrimination." As the Court noted, this statute was predicated on the finding that age discrimination "inflicted on individual workers the economic and psychological injury accompanying the loss of the opportunity to engage in productive and satisfying occupations." Id.
 
 
 75
 The majority's attempt to distinguish Teal on the somewhat circular statement that Massarsky was selected for layoff because "he possessed the least seniority of all employees eligible for layoff", Majority op. at 122 (emphasis added), ignores the critical fact that Massarsky had the least seniority only because a less senior employee was insulated as a result of the policy at issue. The majority had earlier in its opinion recognized that Massarsky "did, of course, show that the challenged employment practices of General Motors had a pernicious effect on him," Majority op. at 121. After the decision in Connecticut v. Teal, the majority cannot take refuge in the assumption that Massarsky was an anomaly and that the layoff would ordinarily fall on employees too young to be protected under the ADEA. See Majority op. at 120-121. By relying on the weight ordinarily given to seniority which might counterbalance the challenged policy, the majority is adopting a "bottom line" analysis discredited in Connecticut v. Teal. As the First Circuit recently noted, Teal requires analysis at the "point at which the employer's neutral criterion has a discriminatory effect. The Court's focus must be on the first step in the employment process that produces an adverse impact ... [here the insulation of students from layoff], not the end result of the employment process as a whole." Costa v. Markey, 694 F.2d 876, 880 (1st Cir.1982).
 
 
 76
 Thus, Massarsky established a prima facie case of disparate impact by showing that the policy to retain students, even if not facially discriminatory, in effect preferred younger employees, and was the reason for his layoff.
 
 B.
 Failure to Recall
 
 77
 In my view, the legal principles set forth above should also govern application of the disparate impact theory to GM's policy classifying GMI students as active employees who, upon graduation, were entitled to fill openings before Massarsky, an older worker, was recalled. Massarsky has shown that this favored group, recent GMI graduates, was younger than 40. He has also shown that he was not recalled while these younger recent GMI graduates were assigned, in preference to him, to the openings in his department. Thereby, he established a prima facie case. It was, then, incumbent upon GM to establish a defense or articulate a legally adequate justification.
 
 III.
 JUSTIFICATION FOR GM'S POLICIES
 
 78
 I believe that the preceding analysis demonstrates that Massarsky established a violation of the ADEA for both the layoff and the failure to recall under the discriminatory treatment theory. As developed above, there was no factual issue as to the composition of the favored groups and hence the policies must be treated as facially discriminatory. It is obvious that a facially discriminatory policy cannot serve as a legitimate nondiscriminatory reason; hence we need not engage in the McDonnell Douglas analysis. Because intent to discriminate was supplied by the establishment and implementation of the challenged policies, no jury issue other than a potential defense was presented on disparate treatment.
 
 
 79
 Massarsky established a prima facie case of disparate impact by the evidence that the policies favored groups of younger persons and had an adverse impact on him. In order to rebut that prima facie case, it was incumbent on GM to articulate the business necessity for these policies, business necessity serving in disparate impact cases as the analog of the articulation of a legitimate nondiscriminatory reason in disparate treatment cases. GM has not claimed business necessity for its policies.
 
 
 80
 It remains to consider whether GM has proven that it falls within the only statutory defense on which it relies--that the differentiations created by the policies are based on "reasonable factors other than age." 29 U.S.C. Sec. 623(f)(1). Massarsky claims that as a matter of law, GM cannot defend this age discrimination claim on corporate policies which are themselves discriminatory as favoring younger workers. Therefore, he argues, he was entitled to judgment n.o.v. He contends that even if we do not agree with his per se illegality analysis, he was at least entitled to jury instructions under which the jury would determine whether these corporate policies could be justified. GM's presentation to this court and the majority's opinion fail to focus on whether GM's policies could be considered as legally justified.
 
 A.
 The Per Se Analysis
 
 81
 Massarsky's Motion for judgment n.o.v. was based on his per se analysis. Even if a plaintiff shows discriminatory treatment or disparate impact, an employer may avert liability by proving a statutory defense. The only statutory defense asserted by GM was that of "reasonable factors other than age." GM's position appears to be that because it treated Massarsky on the basis of its policies, it did not violate the statute.
 
 
 82
 The language of the provision permitting "differentiation ... based on reasonable factors other than age" suggests that the defense is a mirror image of the offense itself. In other words, if the employer proves that the treatment of the employee was based on a reasonable factor other than age, then there has been no age discrimination. Accordingly, an employment policy which by definition favors one age group cannot be a "reasonable facto[r] other than age" although it might be a "bona fide occupational qualification" which concedes the age based discrimination but asserts the affirmative defense that substantially all of a given class would be unable to perform the job. See, e.g., Marshall v. Westinghouse Electric Corp., 576 F.2d 588, 591 (5th Cir.1978). GM does not seek to bring itself within the BFOQ defense.
 
 
 83
 There is much to commend this interpretation of the statutory defense of "reasonable factors other than age." As the original interpretive regulations issued by the Department of Labor recognized, "To classify or group employees solely on the basis of age ... for any ... purpose, necessarily rests on the assumption that the age factor alone may be used to justify a differentiation--an assumption plainly contrary to the terms of the Act and the purpose of Congress in enacting it. Differentials so based would serve only to perpetuate and promote the very discrimination at which the Act is directed." 29 C.F.R. Sec. 860.103(h) (1982). The EEOC, now responsible for enforcement of the ADEA, has taken a similar position. Its regulations state, "When an employment practice uses age as a limiting criterion, the defense that the practice is justified by a reasonable factor other than age is unavailable." 29 C.F.R. Sec. 1625.7(c) (1982).
 
 
 84
 In discriminatory treatment cases, the "reasonable factors" defense will in large measure overlap the legitimate, nondiscriminatory reason which defendant must articulate to rebut intent to discriminate. Similarly, in disparate impact cases, the "reasonable factors" defense will overlap the business necessity upon which defendant must rely if it is to rebut plaintiff's prima facie case. See 29 C.F.R. Sec. 1625.7(d) (1982) (when claimed reasonable factor is an employment practice which "has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity"). In such cases, the "reasonable factors" must be justified as job related, such as physical fitness requirements reasonably necessary for the specific work, evaluation factors such as education or quality of production where validly related to job requirements, and employee tests specifically related to job requirements. 29 C.F.R. Sec. 860.103.-104 (1982). See also Laugesen v. Anaconda Co., 510 F.2d 307, 315 (6th Cir.1975) (job related showing required when purported "reasonable factor" is a policy that may have a disparate impact upon older workers). GM never claimed that its policies were job related or that GMI students were, as a class, better suited to the work. Since age based differentiations cannot be "reasonable factors other than age," and since GM never even proffered a job related justification for its policies, no jury question was presented under either a disparate treatment or impact theory.
 
 
 85
 The majority assumes it is sufficient if GM merely followed its policy, and never examines whether that policy is, in itself, discriminatory. However, in Griggs v. Duke Power Co., the Court stated that the employer could not rely on its policy requiring a high school education or passing of a standardized general intelligence test unless these prerequisites were shown to be significantly related to successful job performance. 401 U.S. at 431, 436, 91 S.Ct. at 853, 856. As this court stated in applying a similar discrimination statute, "If the defendant presents no evidence of business relatedness in his case, the court may assume that there was no permissible reason for the impact." NAACP v. Medical Center, Inc., 657 F.2d at 1334. Since GM did not attempt to show any job relatedness, and apparently takes the erroneous position that it was not required to do so, I believe Massarsky was entitled to judgment n.o.v. on liability.
 
 B.
 Jury Instructions
 
 86
 Even if we do not treat GM's policies as discriminatory per se, those policies could serve as evidence of an intent to discriminate. Similarly, even if we liberally construe this record to assume that GM relied on a business necessity justification, that justification should have been presented to the jury. For reasons which are incomprehensible to me, the district court never instructed the jury on either of these issues.
 
 
 87
 Massarsky made clear throughout the litigation that he based his ADEA claim on the policies which favored GMI students and graduates. Indeed, the district court's order reinstating Massarsky's federal age discrimination claims reflected an agreement between counsel that the factual basis for Massarsky's ADEA claims would be limited to:
 
 
 88
 the circumstances surrounding the alleged permanent placement or hiring of certain General Motors Institute 'students', specifically Joseph Biondo, Arthur Glass, William Mihelc, Gary Schultz, Robert Morella, Harry Ziegler, Jr., Alan Munkascy and Stephen Kienzle, at the Clark plant of the Hyatt Division during the period February 1971 through February 1976.
 
 
 89
 Joint Appendix at 114a (emphasis added).
 
 
 90
 Massarsky adequately preserved his objection to the district court's failure to refer at any point in its jury charge to GM's policies on GMI students and graduates and Massarsky's claim that those policies were discriminatory. His counsel vigorously objected at the charging conference to the district court's failure to make any mention of the relevant policies. See Transcript of Conference of October 2, 1981 at 136-40. The court's charge that Massarsky had to prove intent to discriminate (which as noted above was erroneous since intent was supplied by the policy itself) and that GM claimed the layoff resulted from an economic necessity to reduce the number of process engineers (a conceded fact which skirted the central issue) failed to direct the jury's attention to the heart of plaintiff's case. The district court declined to tell the jury that GM had admittedly based its actions on its internal policies and refused to instruct the jury to consider whether those policies were justified because the district court believed that such instructions would be "[p]ractically a directed verdict" and therefore "prejudicial to the defendants." Id. at 139. The reason given is insufficient. If such a charge in effect amounted to a "directed verdict", that would only have been because of GM's failure to show any justification for its policies.
 
 
 91
 In Geller v. Markham, supra, the trial court instructed the jury that the "sixth step" policy for hiring teachers was discriminatory on the basis of age as a matter of law, and submitted to the jury only the question whether the policy had been applied to plaintiff. 635 F.2d at 1031. Here GM conceded that the policies were applied to Massarsky.
 
 
 92
 The inescapable obligation of the trial court in a jury trial is to explain the legal issues to the jury, instructing the jurors on the appropriate legal principles in language they can understand. See, e.g., Lind v. Aetna Casualty & Surety Co., 374 F.2d 377, 380 (5th Cir.1967); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2556 (1971). The trial court must instruct the jury in accord with a party's contention if it is consistent with the evidence in the case. See Richardson v. Walsh Construction Co., 334 F.2d 334, 338 (3d Cir.1964). As long as a century ago, this court stated, "It is error for the court to submit the evidence and theory of one party prominently and fully to the jury and not call their attention to the main points of the opposite party's case." Weiss v. Bethlehem Iron Co., 88 F. 23, 30 (3d Cir.1898) (Acheson, J.), appeal after remand, 100 F. 45 (1900), cert. denied, 176 U.S. 685, 20 S.Ct. 1027, 44 L.Ed. 638 (1900). The fact that this is an "old" citation does not detract from its correctness or force. In failing to present to the jury the plaintiff's primary contention, the trial court emasculated plaintiff's case. I believe this constituted reversible error.
 
 
 93
 In Title VII cases, unlike ADEA cases, the court serves as the factfinder. Thus, in the Supreme Court's recent Aikens opinion, it noted that the factfinder, there the district court, "must decide which party's explanation of the employer's motivation it believes." Aikens, --- U.S. at ----, 103 S.Ct. at 1482. In this case the factfinder, i.e., the jury, was never instructed on plaintiff's explanation of the reason for employer's action, since the trial court ignored the issue of the policy insulating GMI students and graduates.
 
 
 94
 It may be that Massarsky's claim has received somewhat less than sympathetic treatment by the trial judge and the majority because of their belief that it was reasonable for GM to provide a work study opportunity for GMI students so they could graduate. GM could have accomplished this goal without charging the students to the department's payroll and casting them in competition with older employees. In some plants, for example, General Motors has placed GMI students on personnel or training budgets when departmental slots were unavailable. See Williams v. General Motors Corp., 656 F.2d 120, 123 (5th Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). In any event a goal to protect GMI students until graduation cannot justify classification of GMI graduates as active employees and assigning them to open positions in preference to Massarsky, a laid off employee with more seniority. Significantly, GM never sought to justify its policies on any need to train a supply of new personnel. Had it done so, plaintiff would have had the opportunity to rebut that claim, and to show that a feasible, yet less onerous alternative existed. See NAACP v. Medical Center, Inc., 657 F.2d at 1335.
 
 
 95
 We must not overlook that Congress considered but rejected an exemption for management training programs when it enacted the ADEA. As explained in the House Report accompanying the original bill:
 
 
 96
 The committee also considered a suggestion that section 4(f) be amended to specifically allow for a bona fide management training program....
 
 
 97
 The committee declined to incorporate a specific exception for management training programs since it was believed so broad an exemption in the law might open a very wide door of possible abuse. Almost any training, or opportunity for acquiring experience on a job, might be construed as leading to future advancement to management positions.
 
 
 98
 H.R.Rep. No. 805, 90th Cong., 1st Sess. 4, reprinted in 1967 U.S.Code Cong. & Ad.News 2213, 2217 (emphasis added).
 
 
 99
 There may be some unavoidable instances where the ADEA's protection of the older worker has a countervailing impact on another worthy policy. The majority may be suggesting as much in its otherwise unexplained reference to the fact that the GMI population contains a significant number of minority and female students. However, GM did not seek to justify its policies on the need to train members of groups whom it may have previously neglected. Nor did it seek to justify its policies on any business necessity. GM chose to stand mute on the rationale for its corporate policies. However, as the internal memorandum quoted by the majority makes clear, GM's interest appeared to be in protecting its "considerable investment in these [GMI] students," Majority op. at 119, rather than a social policy of advancing minorities or women.
 
 
 100
 As I have indicated, I believe the appropriate disposition of this case, given GM's failure to explain or justify its policies, is to reverse and direct judgment n.o.v. At a minimum, Massarsky is entitled to a remand for a new trial with proper jury instructions. I dissent from the majority's affirmance.
 
 
 
 [1]
 Federal courts have jurisdiction under 28 U.S.C. Sec. 1337 over violations of the ADEA. Massarsky later sought to amend his complaint to assert a pendent claim under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. Secs. 10:5-1 et seq. (1976). Jurisdiction over this state law claim is invoked under 28 U.S.C. Sec. 1332
 
 
 [2]
 General Motors has filed a cross-appeal, even though the district court entered judgment in its favor on all issues. In view of our disposition of the case, we do not address the cross-appeal
 
 
 [3]
 The handbook states:
 If it becomes necessary to reduce the number of employees in any classification of work within a department, where ability, merit and capacity are equal, the employee with the least service working in such classification in that department shall be laid off.
 
 
 [4]
 General Motors presented evidence showing that GMI is a fully-accredited college that awards degrees in various engineering subjects upon the successful completion of a five-year program. Applicants for GMI are primarily high school students, and the typical beginning student is from 18-20 years of age. During their first four years in the program, GMI students spend part of their time in classes at the GMI campus in Michigan and part of their time in the work-experience program at the General Motors plant sponsoring the student. During the fifth year, the student is assigned on a full-time basis to the sponsoring plant. General Motors guarantees that all GMI students will be given the opportunity to complete their degree requirements (absent academic deficiencies) but does not guarantee employment with General Motors upon graduation. According to the testimony of GMI President Dr. William Cottingham, the purpose of the GMI program is to train future engineering and managerial personnel
 
 
 [5]
 Internal guidelines for reduction in work force distributed to company executives and personnel officials did mention this policy. The relevant portion of the guidelines is set forth at page 12 infra
 
 
 [6]
 Although the General Motors employee handbook stated that laid-off employees were to be "given the opportunity to fill openings in the plant or office from which they were laid off," the handbook did not make clear that all active employees, regardless of length of service, were given preference over laid-off employees in filing available jobs. The handbook described General Motors' policy on recall of laid-off employees in the following terms:
 Laid-off salaried employees whose periods of recall preference have not expired shall be given the opportunity to fill openings in the plant or office from which they were laid off, providing they are qualified to perform the work available. Consideration shall be given to merit, ability, capacity and length of service.
 
 
 [7]
 Initially, Massarsky also claimed that the layoff and failure to recall constituted a breach of his employment contract, a malicious discharge, and religious discrimination. He eventually abandoned the religious discrimination claim and the district court dismissed the breach of contract claim in August 1977. In March 1977 Massarsky amended his complaint to assert state common law claims for fraud and negligent misrepresentations, and to add his wife as a plaintiff who alleged loss of consortium. None of these other claims are involved in this appeal
 
 
 [8]
 On November 20, 1979, the district court dismissed all of Massarsky's age discrimination claims on the ground that he had failed to file with the Department of Labor a timely notice of intent to sue, as required by the ADEA. In addition, the court suggested that Massarsky had abandoned the claim that his layoff violated the ADEA. The court reinstated Massarsky's age discrimination claims on October 31, 1980, based on this court's interpretation in Davis v. Calgon Corp., 627 F.2d 674 (3d Cir.1980), cert. denied, 449 U.S. 1101, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981), that in New Jersey an ADEA complainant has 300 days to file the notice of intent to sue
 
 
 [9]
 29 U.S.C. Sec. 623(a) provides in pertinent part:
 (a) It shall be unlawful for an employer--
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's age;
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;
 ....
 
 
 [10]
 At the time Massarsky brought his action, the upper age limit of the ADEA was 65. Congress extended protection to employees up to 70 years of age in the Age Discrimination in Employment Act Amendments of 1978, Pub.L. No. 95-256, 92 Stat. 189
 
 
 [11]
 This last exception has enjoyed a two-fold interpretation. The concept of a "reasonable factor other than age" may connote the absence of a causal connection between the individual's age and the adverse employment action. See Schwager v. Sun Oil Co. of Pennsylvania, 591 F.2d 58, 62 (10th Cir.1979). In this sense, the exception is unnecessary because if the discrimination resulted from a factor other than age, necessarily there was no discrimination "because of age" that would invoke the provisions of the ADEA. The "reasonable factors" exception has also been interpreted as a defense to discrimination under the ADEA when the employer has made decisions "based on factors that sometimes accompany advancing age such as declining health or diminished vigor and competence." Loeb v. Textron, Inc., 600 F.2d 1003, 1016 (1st Cir.1979). See generally B. Schlei & P. Grossman, Employment Discrimination Law 403 (1976)
 
 
 [12]
 42 U.S.C. Secs. 2000e et seq. (1976 & Supp. V 1981)
 
 
 [13]
 Because Massarsky's complaint concerned a reduction in force, it obviously was unnecessary for him to follow the literal terms of the McDonnell Douglas model and show that he was actually replaced by a younger employee. In McDonnell Douglas, the elements of the plaintiff's prima facie case were articulated in the context of an alleged discriminatory failure to hire. The Supreme Court made clear that the nature of the required showing depends on the circumstances of the case. See 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. See also Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); Williams v. General Motors Corp., 656 F.2d 120 (5th Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); Jackson v. U.S. Steel Corp., 624 F.2d 436, 440 (3d Cir.1980) (Title VII case)
 
 
 [14]
 Of course, disproportionate impact of an employment policy may itself be circumstantial evidence of an intent to discriminate. See Hazelwood School District v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); Teamsters v. United States, 431 U.S. 324, 336-39, 97 S.Ct. 1843, 1854-1856, 52 L.Ed.2d 396 (1977)
 
 
 [15]
 We see nothing in this record to show that there were no older individuals in the GMI program, but see only that GMI students were predominantly recent high school graduates
 
 
 [16]
 During the course of the trial, the district court complained about the shifting nature of plaintiff's theory of recovery
 
 
 [17]
 For an argument that disparate impact analysis should not be applied in age discrimination cases, see Note, Age Discrimination and the Disparate Impact Doctrine, 34 Stan. L.Rev. 837 (1982)
 
 
 [18]
 The dissenting opinion asserts that "virtually 100% of the protected class is in the disfavored group" and that "the fact that the policy may also disfavor laid off workers under 40 does not overcome the discriminatory impact on the protected class." Diss. op., infra, at 130. This assertion, though quite possibly true, is not supported by the record. The evidence does not establish that no members of the protected age class are GMI students and thereby insulated from layoff, but shows only that GMI students are predominantly recent high school graduates. More important, the dissenting opinion assumes the very issue in this case--that the Company's employment practices have a discriminatory impact on the protected class
 The dissent cites Geller v. Markham, 635 F.2d 1027 (2d Cir.1981), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981), but this case is inapposite. In Geller, a hiring policy that made over 90 percent of the protected age class ineligible for appointment to teaching positions was deemed discriminatory as a matter of law, notwithstanding that a majority of teachers under 40 were also excluded from consideration. The court was apparently impressed by the extraordinarily high percentage of protected individuals who were disqualified by the employment practice. The instant case is vastly different. Concerned with layoff rather than hiring, Massarsky has shown at most that relatively few older individuals were insulated from layoff under the GMI program. But this has no significance, because only a very small percentage of the workforce as a whole was insulated from layoff. In addition, many older employees were undoubtedly protected from layoff by the Company's seniority policy. In short, Massarsky's case ignores an essential ingredient that was present in Geller: a showing that the Company's furlough practices had greater impact on protected individuals than on employees outside the protected age group.
 
 
 [19]
 The dissent repeatedly criticizes the majority for failing to address the question whether General Motors' policy could be justified under the statutory defense for "reasonable factors other than age." Because, under the majority's view of the case, there was no discrimination in the first instance, it is unnecessary to consider whether the policy could be "saved" by the statutory defense
 
 
 [20]
 Massarsky complains that the Company's policy of preferring active employees over inactive employees with greater service in filling job vacancies was uncommunicated. It is true that this particular aspect of the Company's employment practices was not explained in the employee handbook. But this has no significance here. Massarsky contends that because "the essential terms and conditions" of the Company's seniority system have not been publicized, the Company's discriminatory practice does not qualify for the exception in section 623(f)(2) of the ADEA for "bona fide seniority systems." But this exception, like the "reasonable factor other than age" exception, only becomes relevant once a plaintiff has shown that the employer's practices had a discriminatory impact. Massarsky has not met his burden of making such a showing
 
 
 [21]
 Massarsky complains that the district court's instruction was subject to the misinterpretation that plaintiff was laid off on the basis of his merit, capacity and ability. The court's instruction, however, was intended merely to list the factors that the Company maintains it considered in selecting employees for layoff, not to identify those that were determinative in the decision. Any misimpression that may unintentionally have been created was cleared up almost immediately when the court stated that "General Motors concedes that all those persons being considered for layoff were of equal merit, capacity and ability."
 
 
 [22]
 Although our dissenting colleague severely criticizes the district judge for failing to instruct the jury according to Massarsky's wishes, we are completely sympathetic with the district court's plight. The plaintiff presented his case in such a chameleonic manner that his theory of the case appears to have changed from day to day. It was only at a very late stage that Massarsky struck upon the disparate impact theory that he now presses upon this court. It is the plaintiff himself who is responsible for any confusion the district court may have felt in its conception of Massarsky's claim
 
 
 [23]
 Massarsky also objects to numerous rulings by the district court excluding certain evidence dealing with the General Motors retirement program. The plaintiff has not met his burden of showing that the court's evidentiary rulings were "inconsistent with substantial justice" under Fed.R.Civ.P. 61. As for Massarsky's assertion that the jury's verdict against him was against the weight of the evidence, we reject this contention as it is without merit
 
 
 [1]
 As GM concedes in its brief, "the retention of Biondo was pursuant to GM policy that GMI students are not subject to layoff." Brief for GM as Appellee at 12
 
 
 [2]
 GM explains the failure to recall Massarsky on the ground that "active employees already on the payroll--e.g. Biondo, Glass, Mihelc, and Schultz [all recent GMI graduates]--were promoted into available positions in the process engineering department during [the time Massarsky was on lay off]." Brief for GM as Appellee at 12
 
 
 [3]
 The ADEA originally defined the protected older worker as one between 40 and 65 years of age. ADEA, Sec. 12, 81 Stat. at 607. It later was amended to raise the upper age limit to 70, Age Discrimination in Employment Act Amendments of 1978, Pub.L. No. 95-256, Sec. 3(a), 92 Stat. 189 (codified as amended at 29 U.S.C. Sec. 631(a) (Supp. V 1981))
 
 
 [4]
 Although the majority suggests such a conclusion is dehors the record, it cannot seriously believe high school graduating classes are composed of persons over 40, particularly when the GMI President defined the GMI class makeup in the 18 or 20 year old category. Even if there were an occasional over 40 graduate, the GMI student population would be overwhelmingly below 40, and the legal analysis would be the same