Geoffrey E. WOODFIELD

v.

Margaret M. HECKLER, Secretary of Health and Human Services and United States of America, Department of Health and Human Services, Social Security Administration.

Civ. A. No. 83–4902.

United States District Court,
E.D. Pennsylvania.

Aug. 7, 1984.

vetz's state law claims is without merit. Therefore, the defendants' motion to dismiss those claims must also be denied.

David Harrison, Philadelphia, Pa., for plaintiff.

David L. Hyman, Asst. Regional Atty., Dept. of Health and Human Services, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

This action was brought by plaintiff against his employer, the Social Security Administration (a component of the Department of Health and Human Services) alleging age discrimination as a result of his demotion on May 3, 1981. Plaintiff brings his action under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.* Trial was held before this court sitting without a jury. Upon

consideration of the evidence, exhibits presented at trial and the post-trial memoranda submitted by the parties, we conclude that age was not the determinative factor in plaintiff's demotion, and therefore find for the defendant.

Plaintiff, Geoffrey E. Woodfield, was born on July 20, 1925. He was hired as a Claims Authorizer Trainee, level GS–7, by the Mid-Atlantic Program Service Center ("MATPSC") of the Social Security Administration ("SSA") on August 19, 1973. This position ultimately leads to the position of Claims Authorizer ("CA"), grade GS–10, to which the plaintiff was promoted on September 14, 1975. (See Defendant's Proposed Findings of Fact, number 1, and Plaintiff's Proposed Findings of Fact, number 1).

The principal function of the MATPSC is to adjudicate and pay Social Security claims which cannot be handled by the local district offices. The responsibility of the CA is to review and authorize claims for benefits under Titles II and XVIII of the SSA. The position is technical in nature and requires a thorough knowledge of the Social Security Act, and applicable laws and regulations. Such expertise is required because the CA "makes the final determination on almost all categories of claims cases which directly affect the beneficiaries involved." *Defendant's Trial Exhibit No. 6*, Social Insurance Claims Examiner (Retirement), Part IIA.

In his function as a CA the plaintiff was assigned to a module. A module is the basic structural office unit within the MATPSC and contains approximately fifty employees in approximately fourteen different positions. Each module, of which there are thirty, is under the direction of a module manager and two assistant managers. Six modules, all doing indentical work and support functions, compose a section. A Section Manager and a Deputy Section Manager are responsible for the direction of each section.

At the time relevant to plaintiff's claim, he was assigned to Module 14 which was a component of Section 3. During that time, the personnel holding the above supervisory positions and their respective ages were: (1) Section 3 Manager, Harry Christopher, age 48; (2) Deputy Section 3 Manager, Nathan Soltman, age 59 (prior to his appointment as Deputy Manager, he was Manager of Module 14); (3) Manager of Module 14, George Donnelly, age 31 (Donnelly succeeded Soltman as Manager); and (4) Assistant Module 14 Manager, Elsie Walker, age 53 (Walker was assigned to Module 14 in June 1979 and was plaintiff's immediate supervisor).

CAs are the highest ranking technical employees in the module. Allocation of work among various CAs within a module is accomplished by assigning each CA responsibility for all cases within a certain range of "terminal digits" of social security numbers. With this system one CA is left over who is referred to as a "floater." The floater's function is to take over work of any CA who is absent or whose work is "backed up." The remaining CAs get their daily work from a location called Technical Process Claims Authorization ("TPCA") which is continually replenished with new cases by clerks from an area called Module Backlog Claims Authorization ("MBCA").

The workflow into Module 14 begins with pre-screening. Three CAs take turns performing this function on a daily basis. The pre-screener examines all incoming work and removes all high-priorities which he routes to TPCA (thus, these cases completely bypass MBCA), disposes of cases that can be completed very quickly and routes the remaining cases to the screener. This entire process takes one hour per day or less. The process was invented by George Donnelly and unique to Module 14. Plaintiff claims that he was never selected as a pre-screener by Donnelly or his assistant.

The next level of workflow input is screening. New cases are screened every day by a CA assigned on a rotation basis. The process requires the screener to examine all incoming work and complete all cases taking five minutes or less to dispose of. This process clears 50–60% of the incoming cases. The remaining cases are

routed to MBCA. The plaintiff claims that he was never selected as a screener by Donnelly or his assistant.

The CA takes his daily work from TPCA tubs. The tubs are sorted by terminal digits which correspond to those assigned the CAs. The floater takes his cases from whichever tubs are most full.

Review of each CA's accuracy and productivity is accomplished by means of a "sample." The section office schedules the review and informs the Module Manager of the day on which the sample is to be taken. The Manager or Assistant Module Manager picks up all work completed by the CA on that particular day and forwards it to the section office. The work is then assigned to a Claims/Recovery Technical Assistant ("CRTA") for review.

Once certification requirements for a CA have been met, the CA is required to maintain that level of proficiency. *Defendant's Exhibit No. 3*, Page 12 of 44. The relevant requirements are an 86–88% range of accuracy with the completion of the equivalent of 13 to 15 routine cases in an 8 hour day. *Plaintiff's Exhibit No. 2*, Page 2 of 28. *Defendant's Exhibit No. 3*, Page 11 of 44. Cases are classified as routine, moderate or complex according to guideline set. *Defendant's Exhibit No. 3, Pages 40–44.*

The CRTA produces a "Quality Evaluation—Individual Case" form for each case contained in the sample. *Defendant's Exhibit No. 3*, Page 42 of 44. Each case is classified by the CRTA as routine, moderate or complex. Also notation is made if the case is especially time consuming. *Id.* The CRTA then evaluates each case to determine whether any deficiencies or inefficiencies are present. A deficient rating for any particular case represents an error in the process performed by the CA that "did not produce the results intended and the defective result has an adverse effect ... on the claimant; or on the Trust Fund." *Defendant's Exhibit No. 3*, Page 25 of 44. Examples of such errors include: (1) incorrect payment amount; (2) incorrect potential payment amount; (3) improper or overlooked beneficiary notices; (4) incomplete or overlooked claims development re-

quired to support the claim determination; and (5) incomplete documentation. *Id.* An efficient rating for any particular case represents an instance "where policies or procedures associated with the adjudication, effectuation and maintenance of claims were misapplied, but the result of the process was ultimately correct or had no effect on the amount paid...." *Id.* at 26 of 44. The major characteristic of this type error is delay or need for rehandling. *Id.* All such determinations are explained by the CRTA on the "Quality Evaluation—Individual Case" form. *Id.* at 42 of 44.

After each case is reviewed, the CRTA prepares a "Quality Evaluation Summary" form. *Defendant's Exhibit No. 3*, Page 43 of 44. The CRTA then computes an accuracy percentage for the entire sample which is derived from guideline set forth in the MATPSC Assessment Guide. *Defendant's Exhibit No. 3*, Pages 11–14.

The CA is then informed of the results of the sample. This is usually done by the CA's manager within the module. *Oral Deposition of Elsie Walker*, Page 13. If any of the CRTA's findings are disputed, the CA can appeal to the CRTA who performed the sample or through channels to the CA's manager within the Module. *Defendant's Pretrial Memorandum*, Page 7.

We now turn to the specifics as they relate to plaintiff's claim. Elsie Walker was assigned Assistant Module Manager of Module 14 in June 1979. George Donnelly replaced Nathan Soltman as Manager of Module 14 in June 1980. Plaintiff testified that he never had an instance of an unsatisfactory rating prior to August 21, 1979. On that date, plaintiff received a 79.5% accuracy rating. *Defendant's Exhibit 13.* By memorandum dated October 24, 1979, plaintiff was told to check his procedures as the August 21 performance rating was not indicative of his past work. Plaintiff responded that "more care would be taken in the future." *Id.* On January 18, 1980, plaintiff's work was again sampled. An accuracy rating of 85.7% was recorded with fourteen cases completed of which nine were considered routine and five were con-

sidered moderately difficult. *Defendant's Exhibit 14.* As documented in a memorandum dated January 31, 1980, most of the deficiencies were determined to be clerical in nature and plaintiff stated that he "would make every effort to minimize these careless mistakes." *Id.*

Plaintiff's work was again sampled on April 18, July 9 and July 29, 1980. The accuracy rating results of these samples were 90%, 75% and 82.1% respectively. These results are documented in a memorandum dated August 12, 1980 regarding a meeting held on August 6 between plaintiff and Elsie Walker. *Defendant's Exhibit 15.* At that meeting plaintiff was informed that 30% of his work would be reviewed over a thirty day period beginning on August 18, 1980, "in the hope that the immediate feedback" would help the plaintiff. *Id.* Plaintiff requested a check list that would aid him in his performance and voiced his great concern over any possible adverse effects his performance could have on his job. *Id.*

Plaintiff's work was sampled on August 19 and 25 and September 2, 9, 15 and 19 of 1980. *Defendant's Exhibit 8.* The overall accuracy percentage was 73.3% and the average productivity rate was 8.2 cases per day. *Defendant's Exhibit 7.* Mr. Donnelly met with plaintiff on September 26, 1980 concerning these sample results. In a memorandum dated September 30, 1980 documenting that meeting, Donnelly upheld the finding of the CRTA as to three cases the plaintiff had appealed. Donnelly also informed plaintiff that his accuracy and productivity rates were far below those required of a CA, and he scheduled a meeting on September 29, 1980 with plaintiff and his representative to discuss the issuance of a formal notice of unsatisfactory performance. *Id.* On September 29, 1980, that meeting was held and documented by memorandum dated September 30, 1980. *Defendant's Exhibit 9.* Donnelly issued to plaintiff a formal notice of unsatisfactory performance. Plaintiff was granted a ninety-day period from October 1 to December 29, 1980, in which to improve his performance to an acceptable level. *Id.* at 2. During this ninety-day period plaintiff's work was again subjected to intensive review,

and plaintiff was informed that if he failed to reach the minimum standards within ninety days that his demotion would be recommended. *Id.* at 3. Plaintiff was also to meet with his supervisor (E. Walker) at least every thirty days to discuss his progress. *Id.* at 2. When asked whether there were any particular circumstances which accounted for his deficient performance, plaintiff stated that his work should be reviewed by more than one CRTA, photocopying should be performed by a clerk, samples were not returned promptly and that CRTAs were not always available to answer questions. *Id.* at 3. Mr. Donnelly promised to help plaintiff with these problems. Mr. Donnelly pointed out that most of plaintiff's errors were documentation related in that he failed to close out all possibilities before making a determination on a case. *Id.* at 3. Plaintiff stated that the effectiveness of the module's screening interfered with his ability to meet numerical standards. Mr. Donnelly replied that such a consideration was relevant to productivity but not accuracy. *Id.*

A meeting was held on December 10, 1980 between Elsie Walker and plaintiff which is documented by memorandum. *Defendant's Exhibit 16.* This memorandum summarizes plaintiff's performance from samples taken from October 3, 1980 through December 1, 1980 as 79.3% accurate with a productivity rate of 8.6 cases per day. *Id.* at 1. This memorandum details certain exchanges that took place between Walker and plaintiff on August 6, 1980 that had not been previously documented. *Id.* at 1. Ms. Walker stated not all exchanges are documented initially because "it would be negative against their record." *Oral Deposition of Elsie Walker,* Page 36. Apparently on August 6, 1980, Elsie Walker offered plaintiff refresher training. Plaintiff replied that the only thing that would help would be a new brain. *Defendant's Exhibit 16,* Page 1. Plaintiff also stated that his age was a determining factor in his poor performance and that the cases had become more complex because the screeners got the easier cases. Plaintiff was provided a check

claims list so that he could check off all pertinent requirements during completion of a case. On December 10, 1980, plaintiff stated that the other CAs have easier work to perform. This claim was negated by Walker. Intensified review was to be extended past December 29, 1980 and the terminal digits were to be realigned to reduce plaintiff's area of responsibility. *Id.* at 3. At this meeting plaintiff stated that he planned to file age discrimination charges against management. *Id.* at 2.

Plaintiff's work was under intensive review from October 1, 1980 to February 20, 1981, the results of which are documented in a memorandum dated March 2, 1981. *Defendant's Exhibit 12.* The overall accuracy rate was 80.9% and productivity was 8.7 cases per day. While plaintiff's accuracy did reach an acceptable level for one month over this period, Mr. Donnelly stated that plaintiff's productivity never reached an acceptable level. *Id.* It was pointed out that an acceptable productivity level was a matter of the manager's judgment but that plaintiff's caseload should have been between eleven to thirteen cases considering the case complexity involved. *Id.* at 2. Plaintiff was informed on February 27, 1981, in the presence of a representative that his results were not acceptable and that his demotion would be recommended. *Id.* at 1.

On March 18, 1981, plaintiff was by official notice informed of Mr. Donnelly's proposal to demote him to a Social Insurance Claims Examiner (Retirement), Benefit Authorizer, GS–8. *Defendant's Exhibit 7.* This demotion entailed a decrease in compensation from $23,195.00 to $21,314.00 per annum. The cited reason for the demotion was the plaintiff's "failure to perform satisfactorily the assigned duties" of the position. *Id.* a 2. The memorandum sets forth the plaintiff's entire record dating back to his first unsatisfactory rating on August 21, 1979. *Id.* Plaintiff was informed that he had the right to reply orally and/or in writing to the proposal, to have a representative assist him with his responses and to furnish affidavits in support of those replies. Plaintiff was instructed to forward all replies to Harry Christopher and that a written decision would be issued. *Id.* at 9. Plaintiff was to remain on active duty pending outcome of the case. *Id.*

On April 10, 1981, Nathan Soltman, Deputy Manager of Section 3 heard oral arguments by plaintiff and his representative to protest plaintiff's removal from the Claims Authorizer position. At this meeting, plaintiff raised a new explanation of his poor performance. He claimed that his problem resulted from his attitude towards his work which results from the way trainees are taught in class. *Defendant's Exhibit 4.* Plaintiff contended that trainees are taught that prior actions are correct and that they need not question prior actions. *Defendant's Exhibit 5* at 1. Mr. Donnelly analyzed the pattern of plaintiff's case errors and found no validity to the claim. *Id.* at 1.

On April 27, 1981, plaintiff was officially notified in writing of the final determination to demote him to a benefits authorizer. *Defendant's Exhibit 5.* Plaintiff was informed of his right to appeal to the Merit Systems Protection Board (MSPB). *Id.* at 2–3. In this appeal plaintiff raised issues of prohibitive discrimination. *Complaint* at 2. The MSPB's final decision upholding the demotion of the plaintiff was rendered on January 19, 1983, and specifically provided that plaintiff could petition the Equal Employment Opportunity Commission (EEOC) for consideration, which plaintiff did on February 18, 1983. The EEOC affirmed the decision of the MSPB on September 2, 1983. Plaintiff subsequently brought this action claiming that he had been discriminated against because of his age.

Plaintiff alleges that one method used to discriminate against him was to non-select him as a screener. He claims that (1) screeners knew when their CA work would be sampled because it always occurred after a CA completed his screening assignment; (2) the failure to meet accuracy and productivity requirements was not treated uniformly in his module, but was instead a matter of judgment; (3) he was the only CA placed on intensive review; (4) the con-

stant intensive review further compounded his problems because of the extreme pressure and extra time required to argue about the errors assigned to him. Also, because of the extra time required he was unable to read releases concerning proper handling of material; (5) his non-selection for screening operated to his detriment because screeners were in a position to hold back easier work for their quarterly sampling and screeners had frequent knowledge of when their sampling would occur; and (6) Elsie Walker and the CRTA who reviewed his work were influenced by Donnelly's desire to discriminate against older people and that Donnelly's discriminatory treatment of plaintiff was a substantial factor in his deficient performance. Plaintiff requests that he be reinstated to his former position with all back pay. For the reasons which follow we find that plaintiff has failed to meet the requirements necessary to prevail on his age discrimination charge.

The plaintiff brought this case under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"). Section 623(a) of the Act provides in pertinent part:

(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;

The protection of the ADEA is limited to those who are at least 40 years of age but less than 70 years of age. 29 U.S.C. § 631(a). The express purpose of the Act is "to promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621.

Section 621 provides:

(a) The Congress hereby finds and declares that—

(1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

(2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

(3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;

(4) the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

(b) It is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employes and workers find ways of meeting problems arising from the impact of age on employment.

Certain forms of age discrimination are permitted and these exceptions are specifically identified in the Act. The first is commonly known as the "BFOQ" exception and permits discrimination "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. § 623(f)(1). The second allows an employer to differentiate among employees when the "differentiation is based on reasonable factors other than age." 29 U.S.C. 623(f)(1). The third allows an employer "to observe the terms of a bona fide seniority system or any bona fide employment benefit plan such as a retirement, pension, or insurance

plan, which is not a subterfuge to evade the purposes of this chapter." 29 U.S.C. § 623(f)(2). Lastly, it is not unlawful for an employer to discharge or otherwise discipline an individual for good cause. 29 U.S.C. 623(f)(3).

Plaintiffs alleging age discrimination under the ADEA have generally been held to the same burdens and allocation of proof as those alleging race or sex discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq. Rodriguez v. Taylor,* 569 F.2d 1231, 1239 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). See *Massarsky v. General Motors Corp.,* 706 F.2d 111, 117–18 (3d Cir.1983). As under Title VII, and ADEA plaintiff may prevail if he can prove either disparate treatment or disparate impact. *Id.* at 117.

■■■ Under the disparate treatment theory, an ADEA plaintiff must show that his employer applied an expressly age-based standard in its treatment of plaintiff. This theory requires the plaintiff to bear the ultimate burden of proving that his treatment was "caused by purposeful or intentional discrimination." *Smithers v. Bailar,* 629 F.2d 892, 898 (3d Cir.1980). The Supreme Court, cognizant of the possible difficulty plaintiff may encounter in obtaining direct evidence of intentional discrimination, has set forth certain rules of proof which give plaintiff the benefit of a presumption. *Massarsky v. General Motors Corp.,* 706 F.2d 111, 118 (3d Cir.1983). *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393 (3d Cir.1984). These rules were first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) in a Title VII context. As adapted to age discrimination these rules require the plaintiff to carry the initial burden to establish a *prima facie* case of discrimination. This may be done by showing: (1) that he is a member of the protected class; (2) that he was qualified for the job that he held; (3) that he satisfied the normal requirements of the job; and (4) that he was the object of adverse action. *McClain v. Mack Trucks, Inc.,* 532 F.Supp. 486, 489 (E.D.Pa.1982); *see Whack v. Peabody & Wind Engineering Co.,* 452 F.Supp. 1369, 1371 (E.D.Pa.1978), aff'd 595 F.2d 190 (3d Cir.1979). This test has been specifically tailored by the Fourth Circuit to apply to a demotion. Under this test, the plaintiff is required to show: (1) that he is in the protected age group; (2) that he was demoted; (3) at the time of the demotion, he was performing his job at a level that met his employer's legitimate expectations; and (4) following his demotion, the plaintiff was replaced by someone of comparable qualifications outside the protected class. *E.E.O.C. v. Western Electric Company Incorporated,* 713 F.2d 1011, 1014 (4th Cir.1983).

■■■ Once the plaintiff has met his burden, the defendant must then articulate "some legitimate non-discriminatory reason" for the treatment of plaintiff. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once the employer has produced such evidence, the plaintiff to ultimately prevail must then submit evidence that the employer's asserted reason was merely pretextual for unlawful discrimination. *McDonnell Douglas,* 411 U.S. at 804. "The ultimate burden of persuasion remains on the plaintiff at all times; the defendant's burden is only to introduce sufficient evidence to create a genuine factual issue concerning the existence of a legitimate justification for the action." *Massarsky,* 706 F.2d at 118.

■■■ Under the disparate impact theory, plaintiff must show that the "employer's adverse action resulted from application of facially neutral criteria which have a disproportionate impact on members of the protected class and which cannot be justified by business necessity." *Id.* at 117. This theory, was first articulated by the Supreme Court in the Title VII case of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Subsequently, a test was devised which applies to age discrimination. The test requires the plaintiff to prove that the facially neutral criteria had a significantly discriminatory

impact. Once such evidence is shown, the employer must then demonstrate that the requirement has a manifest relationship to the employment in question. Even if the employer makes such a showing, the plaintiff may prevail if he shows that the employer was using the practice as a mere pretext for discrimination. *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982).

In the case *sub judice*, plaintiff has brought his claim under the disparate treatment theory. Thus, this court will apply the test enunciated in *McDonnell Douglas* to determine whether plaintiff has proved his *prima facie* case.

The first and second part of this test have easily been met. The plaintiff is a member of the protected age group as he was born on July 20, 1925 thus making him 58 years old and there is agreement that plaintiff was demoted.

The third part of the test requires plaintiff to prove that he was performing his job at a level that met his employer's expectations. The performance history of plaintiff has been set out in this memorandum.

At trial plaintiff offered a variety of documents which were admitted into evidence which he contends substantiates his allegations that his performance was adversely affected by the discriminatory motives of his supervisors. Exhibit 2 details that on June 30, 1980, plaintiff was twenty years older than any other CA in his Module. Exhibits 4, 5 and 6 detail several instances in which plaintiff's work was incorrectly graded and subsequently favorably regarded. Exhibits 7 and 9 attempt to prove that the screening process was detrimental to the plaintiff and that screeners were warned of impending samples. Exhibit 12 attempts to prove that other CAs who performed below standard were not placed on intensive review.

We are unable to ascertain how plaintiff's deficient performance was caused by any of the circumstances detailed in his evidence. The sole performance requirement of plaintiff was 86% accuracy with the completion of 13–15 routine cases per day. Infrequent instances of favorably re-

garded cases as detailed in Exhibits 4, 5 and 6 are insufficient to prove that plaintiff's performance was adequate. Exhibit 7 proves only that the screening process circulated cases faster to the MBCA. This would not affect plaintiff's performance because he was only required to process 13–15 routine cases per day. Exhibit 9, a written statement by Mr. Donnelly, does admit that one CA may have been aware of an impending review but this memo also details how this problem was corrected and the CA subsequently was found deficient and warned that she might not receive her step increase.

Plaintiff relies heavily on Exhibit 12 to prove that he was discriminated against because other CAs who performed below standard were not placed on intensive review. Again, we are unable to agree with plaintiff that this is so. Of the sample histories recorded on this document only five are those of CAs, all of whom are under forty. Of those five, only one displayed a consistent pattern of substandard performance. Elsie Walker explained that this one person was under psychiatric treatment and therefore a special circumstance. *Defendant's Exhibit 20*, Deposition of Elsie Walker, Pages 59–61. Further, this person later resigned. Of the remaining CAs listed, one was warned that she would not receive a step increase if her performance did not improve and another resigned. The other two CAs did not display a consistent insufficient performance.

■ Therefore, because we can find no discriminatory age motive we focus solely on plaintiff's performance and find that he has failed to establish his *prima facie* case because he has failed to prove that he was performing his job at a level that met his employer's expectations.

■ Even assuming that plaintiff had met the requirements to make out his *prima facie* case, the defendant met its burden by articulating legitimate non-discriminating reasons for his demotion. As stated above, once the plaintiff has established a *prima facie* case the burden shifts to the defendant to articulate "some legitimate

non-discriminatory reason" for the treatment of the plaintiff. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. It appears evident from the evidence presented that Mr. Donnelly was a very strict manager and thus required a full day's production from his personnel. *Defendant's Exhibit 20*, Deposition of Elsie Walker, Pages 21–24. Such a manager was not the type that plaintiff was accustomed to. But, we do not find it unlawful for the defendant to require plaintiff to perform at the level required. In fact, the ADEA does not require an employer to prove that a particular decision was "a matter of sound business judgment." *Miller v. General Electric Co.*, 562 F.Supp. 610, 617 (E.D.Pa. 1983). Also, an employer may demote an employee on purely subjective reasons as long as age is not the determinative factor in the decision. *Id.* Thus, we find that by requiring plaintiff to perform at the level required for the position, the defendant has articulated a legitimate non-discriminatory reason for the treatment of plaintiff.

■ Once determined that the employer has offered a legitimate non-discriminatory reason for his decision to demote the employee, the plaintiff may still prevail if he can prove that the employer's reasons were pretextual for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. We conclude that plaintiff has not met his burden in this regard, as we find no evidence to prove that defendant's reasons for the demotion were pretextual, and that age was the determinative factor in the decision to demote him.

In accordance with Rule 52(a) of the Federal Rules of civil Procedure, the above constitutes this Court's Findings of Fact and Conclusions of Law.